William B. YOUNG, Jr., and Joseph Walley, on behalf of themselves and all other persons who are similarly situated; and, Legal Action Center Homeless, Plaintiffs,

Sheron Gilmore, Plaintiff–Intervenor,

v.

**NEW YORK CITY TRANSIT AUTHORITY, Metropolitan Transportation Authority of the State of New York, Metro–North Commuter Railroad Company, The Long Island Rail Road Company, The Port Authority of New York and New Jersey, and Robert R. Kiley, as Chairman of the New York City Transit Authority, the Metropolitan Transportation Authority of the State of New York, the Metro–North Commuter Railroad Company, and the Long Island Rail Road Company, and Robert Abrams, as Attorney General of the State of New York, Defendants.**

No. 89 CIV 7871 (LBS).

United States District Court,
S.D. New York.

Jan. 25, 1990.
As Amended Jan. 29, 1990.

George Sommers, New York City (Geoffrey Potter and John E. Kirklin, of counsel), and Legal Action Center for the Homeless, New York City (Douglas Lasdon and Patrick Horvath, of counsel), for Young plaintiffs.

The Legal Aid Soc., New York City (Jane E. Booth, Adam S. Cohen and Kalman Finkel, of counsel), for plaintiff-intervenor Gilmore.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, pro se (R. Scott Greathead, First Asst. Atty. Gen., Joel Graber and Judith T. Kramer, Asst. Attys. Gen., of counsel).

Susan E. Weiner, Deputy Gen., Counsel, Metropolitan Transp. Authority, New York City, for defendants Metropolitan Transp. Authority, Metro–North Commuter R.R., New York City Transit Authority, The Long Island R.R., and Robert R. Kiley.

Joseph Lesser, New York City (Arthur P. Berg, of counsel), for defendant The Port Authority of New York and New Jersey.

SAND, District Judge.

Plaintiffs, two homeless men who solicit money for themselves in the New York City transit system, bring this action on behalf of themselves and all other persons similarly situated, alleging that various regulations and New York Penal Law § 240.35(1) infringe upon their right to free speech under the First Amendment. Plaintiffs move to amend their complaint, for an order determining that this action is maintainable as a class action, and for a preliminary injunction restraining defendants from enforcing, either through the challenged provisions or any other rule, regulation or statute, a ban on solicitations of money by plaintiffs. For the reasons stated below, plaintiffs' motions are granted in substance without prejudice to the adoption by defendants of reasonable time, place and manner of exercise restrictions on the conduct in question.

## I. BACKGROUND

In August 1989, the Metropolitan Transportation Authority (hereinafter "MTA") Board adopted certain revisions to the New York City Transit Authority (hereinafter "TA") Rules governing use of the transit facilities. An existing rule prohibited any person, unless "duly authorized" by the TA, from soliciting "upon any facility or conveyance ... alms, subscription or contribution for any purpose."[1] 21 State of New York Codes, Rules and Regulations (hereinafter "NYCRR") 1050.6(b) (1976). To this rule was added a provision which "deemed to be authorized" certain non-transit uses including: "public speaking; distribution of written materials; solicitation for charitable, religious or political causes; and artistic performances, including the acceptance of donations." 21 NYCRR 1050.6(c). Regulations 1050.-6(c)(1)-(7) also subjected these non-transit uses to specific express time, place and manner restrictions. These restrictions prohibited the "authorized" non-transit uses in areas not generally open to the public and in subway cars. With the exception of leafletting or distributing literature, campaigning, public speaking or similar activities with no sound production device and no physical obstruction, non-transit uses were also prohibited within twenty-five feet of a token booth or within fifty feet from the marked entrance to an TA office or tower. The amended rules became effective on October 25, 1989.

On October 17, 1989, the TA commenced an information campaign which it labeled "Operation Enforcement." As part of the operation, the TA distributed 1.5 million pamphlets entitled *Introducing Operation Enforcement* which warned that anyone

---

1. "Facilities" was defined as all "property and equipment, ... and real estate and personalty used or held incidental to the operation ... of any rapid transit railroad or omnibus line ..." 21 NYCRR 1050.2(b). "Conveyances" is described as "any subway or rapid transit or train, locomotive, omnibus or other vehicle ... used as a means of transportation of passengers." 21 NYCRR 1050.2(e).

violating the new rules governing behavior in the transit system would be "subject to arrest, fine and/or ejection." "No panhandling or begging" was included in a list of prohibited acts. Over twenty thousand posters of various types were also prepared to publicize the campaign. A single line in all the posters warned that panhandling and begging would lead to arrest, fine and/or ejectment.

Plaintiffs Young and Walley,[2] both homeless men who solicit money entirely for their own benefit throughout the subway system, affirm that they were told by TA police that they could not panhandle and that they would be arrested if they were caught doing so. Both plaintiffs also contend that since the commencement of *Operation Enforcement*, they were directed on several occasions to vacate subway platforms or cars. Plaintiffs attest that their conduct consists of approaching passers-by in subway stations, on platforms and in walkways, asking them for money, and answering any questions they might have.

On November 28, 1989 plaintiffs commenced this action on behalf of themselves and a class defined as all homeless or needy persons who are or will be asking or soliciting others for charity in the train or bus or subway stations of New York City or all other places within the jurisdiction of defendants where this is prohibited. Plaintiffs allege that the TA rules violated their rights under the First and Fourteenth Amendments of the United States Constitution and Article 1, §§ 6, 8 & 11 of the New York State Constitution.[3] On December 1, 1989, this Court heard oral argument on plaintiffs' application for a preliminary injunction. Before the Court, plaintiffs confirmed that they were not challenging the TA's authority to apply the time, place and manner restrictions outlined in § 1050.6(c) to their conduct, but rather were contesting defendants' decision to distinguish plaintiffs from others soliciting for charitable purposes.[4] In the course of oral argument, the Court granted Sheron Gilmore's motion to intervene as a plaintiff,[5] directed the parties to brief certain additional issues, encouraged the parties to explore a consensual resolution of the case in light of plaintiffs' expressed willingness to agree to reasonable time, place and manner restrictions, and enjoined defendants from putting up or distributing additional posters.

In the interim, the TA once again amended 21 NYCRR 1050.6(b) & (c). The amended rule provides:

> (b) No person, unless duly authorized by the Authority, shall engage in any commercial activity upon any facility or conveyance. Commercial activities include (1) the advertising, display, sale, lease, offer for sale or lease, or distribution of food, goods, services or entertainment (including the free distribution of promotional goods or materials), and (2) the solicitation of money or payment for food, goods, services or entertainment. No person shall panhandle or beg upon any facility or conveyance.

**2.** Plaintiff Legal Action Center for the Homeless is a not-for-profit organization that provides the homeless with various legal and social services.

**3.** Plaintiffs originally named as defendants the MTA, the TA, Metro–North Commuter Railroad Company (hereinafter "Metro–North"), and Robert Kiley, Chairman of the TA, the MTA, and Metro–North. The MTA, a public benefit corporation consisting of a chairman and sixteen other members appointed by the Governor with Senate advice and consent, has responsibility for the continuation, development and improvement of commuter transportation and other services related thereto in a district encompassing the city of New York and the counties of Dutchess, Nassau, Orange, Putnam, Rockland, Suffolk and Westchester. New York Public Authorities Law §§ 1262–64 (McKinney 1982 & Supp.1990).

The TA, a public benefit corporation consisting of the chairman and members of the MTA, is responsible for the acquisition and operation of transit facilities in New York City. *Id.* at § 1201–02. Metro–North, an MTA subsidiary composed of a chairman and members of the MTA, is responsible for running the Harlem, Hudson and New Haven lines. *The Green Book 1989–90 The Official Directory of the City of New York* at 319 (1989).

**4.** *See* Transcript of Oral Argument dated December 1, 1989 at 9–10.

**5.** Like Plaintiffs Young and Walley, Ms. Gilmore solicits money in the subways, and she also alleges that TA police have attempted to prevent her from doing so. Plaintiff–Intervenor Gilmore is represented by The Legal Aid Society.

(c) Except as expressly authorized and permitted in this subsection (c), no person shall engage in any non-transit uses upon any facility or conveyance. Non-transit uses are non-commercial activities that are not directly related to the use of a facility or conveyance for transportation. The following non-transit uses are authorized and permitted by the Authority, provided they do not impede transit activities and they are conducted in accordance with the rules governing the conduct and safety of the public in the use of facilities of New York City Transit Authority and Manhattan and Bronx Surface Transit Operating Authority: public speaking; distribution of written non-commercial materials; artistic performances, including the acceptance of donations; solicitation for religious or political causes; solicitation for charities that (1) have been licensed for any public solicitation within the preceding twelve months by the Commissioner of Social Services of the City of New York under § 21–111 of the Administrative Code of the City of New York or any successor provision, or (2) are duly registered as charitable organizations with the Secretary of State of the State of New York under § 172 of the New York Executive Law or any successor provision, or (3) are exempt from federal income tax under § 501(c)(3) of the United States Internal Revenue Code or any successor provision. Solicitors for such charities shall provide, upon request, evidence that such charity meets one of the preceding qualifications.

Defendants' Fourth Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction at 2–3. On December 15, 1989, the Court wrote the Attorney General of the State of New York, Robert Abrams, to provide notice that this case appeared to call into question the constitutionality of New York Penal law § 240.35(1) (McKinney 1989). § 240.35(1) stipulates that: "[A] person is guilty of loitering when he ... [l]oiters, remains or wanders about in a public place for the purpose of begging ..."

On December 18, 1989 the Court heard additional oral argument and issued an order, pursuant to an oral opinion,[6] temporarily restraining defendants from enforcing the amended rules insofar as they prohibited begging or panhandling in areas in which the TA authorized charitable solicitation. At the Court's suggestion, plaintiffs agreed to file an amended complaint explicitly challenging New York Penal Law § 240.35(1) and naming the New York State Attorney General as a defendant. This action was prompted by defendants' assertion that transit police, as duly authorized peace officers, were doing no more than enforcing that provision of the state penal law.

On December 27, 1989, plaintiffs filed an amended complaint which, in addition to naming the Attorney General as a party defendant[7] and challenging § 240.35(1), named the Port Authority of New York and New Jersey[8] (hereinafter

---

**6.** *See* Transcript of Oral Argument dated December 18, 1989.

**7.** The Attorney General argues that because he has no statutory authority to enforce the challenged provisions, plaintiffs' amended complaint does not assert any cause of action against him. At oral argument, counsel for the Attorney General indicated that he would continue to participate in the case whether or not the Attorney General remained a party. *See* Transcript of Oral Argument dated January 22, 1990 at 33. Insofar as plaintiffs' complaint may be read as seeking relief against the Attorney General other than a declaration of unconstitutionality of § 240.35(1), it fails to state a claim and is dismissed. The sole purpose of naming the Attorney General as a party was to insure his participation at all stages of this proceeding.

**8.** The Port Authority of New York and New Jersey, whose jurisdiction includes the Port Authority Bus Terminal and the World Trade Center, is a body corporate and politic created pursuant to a compact between the States of New York and New Jersey for the purpose of developing the Port of New York. New York Unconsolidated Laws § 6403 (McKinney 1979). The Long Island Rail Road Company, an MTA subsidiary composed of the chairman and members of the MTA, provides commuter and freight services within the counties of Nassau and Suffolk and within New York City. *The Green Book 1989–90 The Official Directory of the City of New York* at 318 (1989).

"Port Authority") and the Long Island Rail Road Company as defendants and alleged that various rules governing the World Trade Center and the Port Authority Bus Terminal also violated the United States and New York State Constitutions. One of those provisions provides that: "[n]o person shall solicit funds or contributions for any purpose at the [Port Authority Bus] Terminal without permission." 21 NYCRR 1220.16.[9] In its brief, the Port Authority represents that in practice permits are given for First Amendment activities in the World Trade Center and the Port Authority Bus Terminal on a first come first served basis. *See* Memorandum of Port Authority in Opposition to Motion for Preliminary Injunction at 5. However, because the Port Authority interprets Penal Law § 240.35(1) as prohibiting begging and panhandling, no permits are issued for those particular purposes. *Id.*

On January 22, 1990, during a third session of oral argument, plaintiffs agreed to move to include all twelve Commissioners of the Port Authority as defendants instead of only the Chairman of the Board of Commissioners [10] and to seek certification of a class composed of all needy persons (regardless of their status of homelessness) who live in New York, who are or will be asking or soliciting others for charity for their own benefit in the train, bus or subway stations of New York City or all other places within the jurisdiction of defendants.[11] Counsel for the TA clarified that while one of the purposes of the TA regulation was to enforce the New York penal provision, the regulation would continue to be enforced regardless of the validity of the statutory provision.[12] The Court requested additional submissions, due on January 30, 1990, on the issue whether any relief the Court granted should be preliminary or permanent, and reserved decision.

## II. DISCUSSION

### A. *Motion to Amend Complaint*

Plaintiffs seek leave to amend their complaint to add as defendants the twelve members of the Board of Commissioners of the Port Authority of New York and New Jersey, and to expressly include 21 NYCRR 1220.16, 21 NYCRR 1220.25, and 21 NYCRR 1290.3 within the ambit of the phrase "any other law, rule, or regulation." Fed.R.Civ.P. 15 provides that such leave is to be "freely given when justice so requires." Plaintiffs' motion is granted.

### B. *Motion to Certify Class*

Plaintiffs also move for an order pursuant to Fed.R.Civ.P. 23(c)(1) determining that this action is maintainable as a class action. The proposed class is now defined as "all needy persons who live in the State of New York, who are or will be asking or soliciting others for charity for their own benefit in the train, bus or subway stations of New York City or all other places within the jurisdiction of defendants where this is presently prohibited." The Court finds no merit to defendants' argument that plaintiffs are not proper class representatives or that the proposed class is geographically overbroad class. Plaintiffs have challenged a statute and regulations that, if taken together, prohibit begging and panhandling throughout the state. Moreover, there is no reason to believe that plaintiffs cannot adequately represent non-residents of New York City who wish to solicit money in the City transit system or needy people who wish to solicit money in areas within the defendants' jurisdiction outside New York City. The Court reserves decision on whether the Legal Action Center for the Homeless should be

---

**9.** The additional provisions of the World Trade Center and Port Authority Bus Terminal Revised Rules and Regulations implicated by the claims in this case include: 21 NYCRR 1220.25 ("No person, unless duly authorized by the Port Authority, shall, in ... the [Port Authority Bus] Terminal ... solicit alms"); 21 NYCRR 1290.3 ("No person at the World Trade Center, unless duly authorized in writing by the Port authority, shall ... solicit funds for any purpose.")

**10.** *See* Transcript of Oral Argument dated January 22, 1990 at 20.

**11.** *See* Transcript of Oral Argument dated January 22, 1990 at 9–12.

**12.** *See* Transcript of Oral Argument dated January 22, 1990 at 43–44.

either a party or a class representative in this action. Since individual class members are named as parties plaintiff, the status of the Center as a party plaintiff is not critical to plaintiffs' motions. Plaintiffs' motion for class certification is therefore granted.

### C. Standards for Preliminary Injunction

Plaintiffs' application is for a preliminary injunction. In the Second Circuit, a party seeking injunctive relief must establish that the injunction is necessary to prevent irreparable harm and either (i) that he is likely to prevail on the merits of the case or (ii) there exist "sufficiently serious questions going to the merits as to make them a fair ground for litigation, together with a balance of hardships tipping decidedly toward the movant." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). There are also at least two instances where a heightened showing is required. First, when the preliminary injunction is mandatory as opposed to prohibitory, an injunction should issue " 'only upon a clear showing that the moving party is entitled to the relief requested,' or where 'extreme or very serious damage will result' from a denial of preliminary relief." *Id.* (citations omitted).[13] Second, where a preliminary injunction will grant a party all the relief he seeks, the party must show "a substantial likelihood of success on the merits, *i.e.,* that their cause is considerably more likely to succeed than fail ..." *Id.* at 1026.

The injunction sought in this case, like the injunction in *Abdul Wali,* is more prohibitory than mandatory.[14] While the status quo would be upset by the injunction, the relief would essentially prevent the defendants from enforcing the rules and would not require any affirmative act other than the obliteration of the single line in the TA's posters which lists begging or panhandling as a proscribed activity.

The injunction sought in this case would also not grant the plaintiffs all the relief they seek. In *Abdul Wali* the plaintiffs only sought access to the report, and once the prison officials were enjoined from preventing the inmates from receiving it, plaintiffs had received all the relief they sought. This case is more like *Eng v. Smith,* 849 F.2d 80 (2d Cir.1988), where the Second Circuit affirmed a district court injunction which required prison officials to maintain mental health services in accordance with certain specified procedures. The Court in *Eng* found that preliminary relief would not be complete because the injunction would end if the plaintiffs' claims ultimately proved unsuccessful. *Id.* at 82. Here, as in *Eng,* the preliminary injunction will terminate if plaintiffs' claims are not ultimately successful.

■ Since a heightened showing is not required in this case, plaintiffs must demonstrate that they will suffer an irreparable harm and either (i) that they are likely to prevail on the merits or (ii) that there exist sufficiently serious questions going to the merits as to make them a fair ground for litigation and that the balance of hardships tips decidedly toward plaintiffs.

### D. Irreparable Harm

■ The named plaintiffs have affirmed that they rely upon panhandling and begging for their very survival. Defendants have indicated that panhandlers and beggars can be punished with ejection from transit terminals and facilities. The Court takes judicial notice of the fact that cold winter temperatures presently await these ejected panhandlers and beggars. In addi-

---

**13.** The Court in *Abdul Wali* also recognized the limited utility of the distinction between mandatory and prohibitory injunctions, observing that in many instances the difference was "more semantical than substantive." 754 F.2d at 1025.

**14.** In *Abdul Wali,* inmates of New York correctional facilities sought to enjoin the prison officials from preventing inmates from receiving copies of a report containing criticisms and complaints about the conditions at the Attica

facility. The Court noted that the inquiry must go beyond simply determining whether or not the *status quo* will be maintained. *Id.* at 1025. Contrasting the relief actually sought with a hypothetical injunction requiring prison officials to furnish copies of the report to the inmates, the Court found the injunction to be "more prohibitory than mandatory." *Id.* at 1026.

tion, the Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). Thus, if plaintiffs show that enforcement of the various rules and regulations violates their First Amendment rights, they will have demonstrated irreparable injury and that the balance of hardships tips decidedly in their favor.

### E. *The Merits*

Plaintiffs allege that the challenged rules and regulations, both on their face and as applied to plaintiffs, violate their rights to freedom of speech under the First Amendment of the United States Constitution.[15] Plaintiffs argue further that the challenged rules and regulations are nothing more than anti-loitering provisions, violative of their due process rights, and a pretext for evicting the homeless and destitute from locations under the jurisdiction of defendants. For their part, defendants maintain that panhandling and begging are not protected speech, that the transit system is not a traditional or designated public forum, and that the prohibitions on panhandling and begging serve significant state interests which would justify the regulation of speech. The Court will examine these issues with an eye toward determining whether there exist sufficiently serious questions going to the merits of the dispute as to make them a fair ground for litigation or whether plaintiffs have shown a likelihood of success on the merits.

#### 1. New York Penal Law § 240.35(1)

■ Since the TA has argued that its regulation is designed at least in part to enforce the state penal provision, and since the Port Authority has cited the penal provision to explain its refusal to grant permits for begging, we begin our analysis by considering New York Penal Law § 240.35(1). Section 240.35(1) is challenged

as violative of Article I, § 6 (due process) of the New York State Constitution.[16]

In *People v. Bright*, 71 N.Y.2d 376, 526 N.Y.S.2d 66, 520 N.E.2d 1355 (1988), the New York Court of Appeals outlined a test that loitering statutes must pass under the Due Process Clause of the New York Constitution. Such statutes will be upheld "only when they either prohibit[ ] loitering for a specific illegal purpose or loitering in a specific place of restricted access." *Id.* at 384, 526 N.Y.S.2d 66, 520 N.E.2d 1355 (citations omitted). Section 240.35(1), which prohibits loitering in a public place for the purpose of begging, fails this test. First, by definition, a "public place" cannot also be a place of restricted access. *Cf. People v. Johnson*, 6 N.Y.2d 549, 190 N.Y.S.2d 694, 161 N.E.2d 9 (1959) (upholding provision prohibiting loitering in school buildings, where access was restricted); *People v. Merolla*, 9 N.Y.2d 62, 211 N.Y.S.2d 155, 172 N.E.2d 541 (1961) (finding statute prohibiting loitering for other than lawful purposes on waterfront, which serviced only commercial needs of shippers, to be constitutional). Second, begging alone does not appear to be unlawful. There is no other provision of New York law which prohibits begging itself. *Cf. People v. Smith*, 44 N.Y.2d 613, 407 N.Y.S.2d 462, 378 N.E.2d 1032 (1978) (upholding statute prohibiting loitering for the purpose of committing unlawful act of prostitution); *People v. Pagnotta*, 25 N.Y.2d 333, 305 N.Y.S.2d 484, 253 N.E.2d 202 (1969) (finding statute which made it illegal to loiter for purpose of committing crime of possessing or using narcotic drugs to be constitutional).

■ The Attorney General argues in his memorandum, *see* Memorandum of Law of Attorney General at 11, that § 240.35(1) by its own terms also makes begging illegal. *But see* Transcript of Oral Argument January 22, 1990 at 34–35. However, the statute cannot be read as the Attorney General's memorandum suggests, for it clearly prohibits only loitering for the purpose of

---

**15.** The First Amendment provides: "Congress shall make no law ... abridging the freedom of speech[.]" U.S. Const. amend. I.

**16.** Article I, § 6 provides: "No person shall be deprived of life, liberty or property without due process of law." N.Y. Const. art. I, § 6.

begging, not begging in and of itself. One may loiter and not beg; one may beg and not loiter. One can beg without loitering with the intent to beg by, for example, begging door-to-door or selecting a single passer-by to solicit and then leaving the vicinity immediately. Conceivably, one may even beg by mail. Moreover, if a prohibition on loitering for a specific purpose could have the consequence of declaring that purpose illegal even absent a specific prohibition on such conduct in a non-loitering context, the New York Court of Appeals test enunciated in *Bright* would be significantly undermined.

The case before the Court resembles *People v. Uplinger,* 58 N.Y.2d 936, 937, 460 N.Y.S.2d 514, 515, 447 N.E.2d 62, 63 (1983), *cert. dismissed as improvidently granted,* 467 U.S. 246, 104 S.Ct. 2332, 81 L.Ed.2d 201 (1984), where the Court of Appeals struck down a statute which made it a crime to loiter "in a public place for the purpose of engaging, or soliciting another person to engage, in deviate sexual intercourse or other sexual behavior of a deviate nature ..." The Court found that: "Inasmuch as the conduct ultimately contemplated by the loitering statute may not be deemed criminal, we perceive no basis upon which the State may continue to punish loitering for that purpose." *Id.* Here, the conduct at issue, begging, has not been made criminal, and the state similarly has no basis upon which to continue prohibiting loitering with the intent to beg.

Absent some clearer indication of legislative intent, there is simply no basis for the Court to conclude that the state legislature, once clearly confronted with the issue, would chose to criminalize all begging. As plaintiffs note, begging has at times been recognized as socially acceptable conduct which several religions appear to sanction and to bestow praise upon those who respond to beggars' entreaties. The statute in question antedates the numerous deci-

sions of the United States Supreme Court [17] and the New York State Court of Appeals [18] invalidating loitering statutes. Rather than a blanket prohibition on begging, the legislature might see fit to adopt reasonable time, place and manner restrictions. Or, the state legislature might see fit to leave the question solely for resolution by local authorities.

Given all the unanswered questions, the resolution of which is in the first instance a legislative not a judicial function, and the requirement that a penal statute clearly define and give sufficient notice of the conduct that is proscribed, the Court finds that New York Penal Law § 240.35(1) violates the due process clause of the New York Constitution. Having rejected § 240.35(1) as a predicate for regulating begging, the Court turns its focus to the TA and Port Authority regulations challenged by plaintiffs.

### 2. First Amendment Protection for Panhandling and Begging

■ The TA asserts that regardless of the validity of § 240.35(1), its regulations, which prohibit begging and make no reference to loitering, are valid. Even if one assumes that begging, apart from loitering for that purpose, is not per se unlawful, it does not follow that it is conduct which the defendants may not prohibit. Not every lawful activity may be conducted on transit facilities. The first question for the Court to answer therefore is whether panhandling or begging is protected by the First Amendment.

Neither New York Penal Law § 240.35(1) nor any of the regulations adopted by defendants provides a definition for either begging or panhandling. The Random House Dictionary of the English Language defines "beg" as "to ask for as a gift, as charity or as a favor: to beg alms." The Random House Dictionary of the English Language, 188, 1402 (2d Ed. 1987). "Pan-

17. *See Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

18. *See People v. Bright, supra; People v. Uplinger, supra; People v. Berck,* 32 N.Y.2d 567, 347 N.Y.S.2d 33, 300 N.E.2d 411, *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973); *People v. Diaz,* 4 N.Y.2d 469, 176 N.Y.S.2d 313, 151 N.E.2d 871 (1958).

handle" is defined as "to accost passers-by on the street and beg from them." *Id.* Other dictionaries draw less of a distinction between the two terms, eliminating from the definition of panhandling the connotations of assault or harassment that can be associated with the term "accosting."[19] Although one court has based its decision on a distinction between accosting for the purpose of begging and simply begging,[20] all the regulations challenged by plaintiffs are directed toward either begging or soliciting alms, not just panhandling. As a result, all the parties to this case and the Court agree that any distinction between panhandling and begging should not be dispositive of this motion.

### a) First Amendment Protection of Solicitations for Money

■ In a series of cases, the Supreme Court has addressed the extent to which solicitations for money are protected by the First Amendment. In *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), the Supreme Court struck down a statute which prohibited solicitation of contributions by charitable organizations that did not use at least 75 percent of their receipts for charitable purposes. The Court observed that charitable appeals for funds "involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Id.* at 632, 100 S.Ct. at 834. More specifically, the act of solicitation itself was described as "intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues ..." *Id.* The Court did not define "charitable solicitations" or decide when, or if, a solicitation of money ever ceased to be informative or persuasive speech. However, the Court did

stress its concern that the 75–percent rule burdened organizations whose primary purpose was not to provide money or services to the poor but to disseminate information or advocate positions on matters of public concern, implying that a solicitation which was not intended to benefit directly another person could still warrant protection. At the very least, the Court's holding indicates that a solicitation where 25% of the funds solicited might have been intended to benefit no one other than the solicitor could be considered protected speech.

In *Secretary of the State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), the Court struck down a statute which included a percentage limitation similar to the one in *Schaumburg* but also directed the Secretary of State to issue rules and regulation to permit a charitable organization to pay more than 25% of its gross income for expenses in connection with fundraising where the 25% limitation would prevent the organization from raising contributions. The Court reiterated that its concern was that the statute would restrict First Amendment activity which "results in high costs but is itself a part of the charity's goal," *id.* at 967, 104 S.Ct. at 2852, implying once again that the speech associated with solicitation may require protection even if much of the money solicited was never intended to reach a suitable recipient of charity.

In *Riley v. National Fed'n of the Blind of N.C.*, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), the Court struck down a statutory scheme designed to regulate fees charged by professional fundraisers who engaged in charitable solicitations. Under the scheme, a fee consisting of 20% of the gross receipts was deemed reasonable; a fee between 20–35% was deemed unreasonable upon a showing that the solicitation did not involve the "dissemination of information, discussion, or advocacy re-

---

**19.** *See* The American Heritage Dictionary of the English Language 118, 946 (1976) (defining beg as to "ask for as charity;" to "ask earnestly for, or of;" to "solicit alms;" and to "make a humble or urgent plea," and defining panhandle as to "beg, especially on the streets").

**20.** *See Ulmer v. Municipal Court for Oakland–Piedmont J.D.*, 55 Cal.App.3d 263, 127 Cal.Rptr. 445 (Ct.App.1976) (upholding statute which prohibited accosting persons in any public place for the purpose of begging because it excluded person who merely "sits or stands by the wayside").

lating to public issues as directed by the [charitable organization] which is to benefit from the solicitation;" and a fee exceeding 35% was presumed unreasonable, but the fundraiser had the opportunity to rebut the presumption by demonstrating that the fee was necessary either "(1) because the solicitation involved the dissemination of information or advocacy on public issues directed by the charity, or (2) because otherwise the charity's ability to raise money or communicate would be significantly diminished." *Id.* at 2671. The Court rejected the government's argument that even if charitable solicitations were generally fully protected, the statute regulated only commercial speech because it related only to the professional fundraiser's profit from the solicited contribution. The Court began by noting that it was "not clear that a professional's speech is necessarily commercial whenever it relates to that person's financial motivation for speaking." *Id.* at 2677. Even though the solicitor presumably intended to benefit only himself, the Court held that charitable solicitations such as those undertaken by professional fundraisers were "inextricably intertwined with otherwise fully protected speech." *Id.* Because such expression could not be "parcel[ed] out" with one test applied to one phrase and another test applied to another phrase, only the test for fully protected expression was to be applied. *Id.*

The issue to be decided by this Court is whether a meaningful distinction can be drawn for First Amendment purposes between a professional fundraiser requesting a donation from a passer-by on behalf of a charitable organization and a similar request by a destitute individual on his own behalf. Among the possible distinctions that have been brought to the attention of the Court are the allegedly diminished communicative content of begging, the differences between the relative intents of the two types of solicitors, and the historical treatment of begging. Each of these possible distinctions will be considered in turn, and on the basis of the analysis presented below, the Court concludes that a meaningful distinction cannot be drawn for First Amendment purposes between solicitations for charity and begging.

### 1) *The Communicative Aspects of Begging*

Plaintiffs Young and Walley both affirm that their solicitations frequently provoke questions from passers-by and that they often describe to people what it is like to be homeless, express their views on public programs designed to assist them and advocate the cause of the homeless. *See* Affidavits and Supplemental Affidavits of Joseph Walley and William Young. The simple request for money by a beggar or panhandler cannot but remind the passer-by that people in the city live in poverty and often lack the essentials for survival. Even the beggar sitting in Grand Central Station with a tin cup at his feet conveys the message that he and others like him are in need. While often disturbing and sometimes alarmingly graphic, begging is unmistakably informative and persuasive speech.

Both solicitors for organized charities and beggars approach passers by, request a donation, and perhaps explain why they want the money. The conduct of both types of solicitors, as well as what they actually say, may often be quite similar. Although the beggars' entreaties may be more personal, emotionally charged and highly motivated, the substance is in essence a plea for charity. There has been no showing that plaintiffs' solicitations will inevitably contain more belligerent or threatening language. Other provisions, not here in question, prohibit certain forms of abusive or assaultive conduct. *See infra* p. 358. To argue, then, that solicitations for money by beggars have less communicative content than solicitations by organized charities is to differentiate more on the basis of the source of the speech than on its content. It is of course well established that "[t]he inherent worth of speech in terms of its capacity for informing the public does not depend upon the identity of its source ..." *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978).

## 2) *The Intentions of the Solicitor*

The professional fundraiser is soliciting money on behalf of charitable organizations which then presumably transfer the funds to worthy recipients. Defendants point out that whereas the beggar is soliciting money only for himself, the fundraiser intends at least part of the benefit of his solicitation to go to someone other than himself. In *Schaumburg, Munson* and *Riley*, the Supreme Court held that the First Amendment protected charitable solicitations. In deciding whether begging is also protected under the rubric "charitable solicitations," the Court must confront the questions which the Supreme Court did not address in those cases: What constitutes a charitable solicitation? Is an intent to benefit someone other than the solicitor an essential component of a charitable solicitation?

There is nothing in the dictionary definition of "charity" which suggests that money given to a beggar who solicits it is not charity. The American Heritage Dictionary defines charity as "[t]he provision of help or relief to the poor" or "[s]omething that is given to help the needy." The American Heritage Dictionary of the English Language 226 (1976). Whether the donation is solicited by a fundraiser or directly by the recipient is simply not relevant to determining whether the solicitation was for charity.[21] Moreover, distinguishing between charitable and non-charitable solicitations on the basis of the intent of the solicitor would lead to the anomalous situation where one homeless person could not solicit for himself but two homeless people could solicit donations for each other.

That a speaker who seeks to make a profit from his speech can still be entitled to First Amendment protection is well established. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).[22] As was discussed earlier in this opinion, *see supra* pp. 351–52, the thrust of the Court's holdings in *Schaumburg, Munson* and *Riley* was that the speech associated with solicitation may require protection even if much of the money solicited was never intended to reach a suitable recipient of charity. Moreover, the *Riley* Court recognized that even a statute specifically designed to regulate speech related only to the professional fundraiser's profit from the solicited contribution could run afoul of the First Amendment. The Court concludes, therefore, that begging cannot be distinguished from charitable solicitations on the basis of the intent of the solicitor.

## 3) *The Historical Treatment of Begging*

Though begging has been regulated, monitored and at times prohibited throughout history, there is nothing to suggest that begging has been universally viewed with the rancor and enmity of, say, obscenity. *See generally Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) (Stevens, J.). In early English common law, begging by those able to work was prohibited, but beggars who were unable to work were licensed and restricted to specific areas where their begging was permitted. 3 J. Stephen, *A History of the Criminal Law of England* 266–75 (1883). Thus, while reflecting a strong abhorrence to begging by those able to work, early English law contains no suggestion that beg-

---

**21.** Whether something is charity appears to depend more on the donor's motives than on the motives of the recipient. If a donor gives a quarter to a beggar to help that person because he is poor, the donation is charity, whether the donation was solicited by someone other than the recipient or the recipient himself.

**22.** "Speech ... is protected even though it is carried in a form that is 'sold' for profit, and even though it may involve a solicitation to purchase or otherwise pay or contribute money." 425 U.S. at 761, 96 S.Ct. at 1825 (citations

omitted). *See also Goldstein v. Town of Nantucket*, 477 F.Supp. 606, 609 (D.Mass.1979) (holding that street troubadour who accepts contributions during his public performances by act of accepting contributions does not dilute his First Amendment rights and fact that he accepts contributions does not broaden defendant's limited mandate to exercise impartial regulations upon the use of the sidewalks for public expression); *Bellotti*, 435 U.S. at 783, 98 S.Ct. at 1419; *Calash v. City of Bridgeport*, 788 F.2d 80, 82 (2d Cir.1986).

gars unable to work and in compliance with licensing or geographical restraints were engaged in unlawful conduct.

In New York in the Nineteenth Century, the crime of vagrancy encompassed solicitation of alms or charity by the "able bodied or sturdy" and "wandering abroad and begging" generally. Laws of 1833, c. 11 § 1. Such provisions were interpreted, at least with respect to children, as prohibiting asking for money, standing silently with a placard or holding out one's hand. *See Matter of Haller,* 3 Abbott's New Cases 65 (1st Dep't 1877). Presently in the United States, however, only 25 states have statutes pertaining to begging. Thirteen of these statutes do not proscribe begging but grant power to various authorities within the state to regulate and punish begging or some variation.[23] Two statutes adopt the old common law rule and prohibit begging only by those able to work.[24] Four additional statutes resemble the New York penal provision and prohibit loitering for the purpose of begging.[25] The remaining states proscribe either begging or a form of activity analogous to begging.[26]

Several American state courts have considered statutory or regulatory prohibitions similar to the type at issue in this case and

have reached differing results. In *Ulmer,* 55 Cal.App.3d 263, 127 Cal.Rptr. 445, a California appellate court rejected a challenge based upon overbreadth and vagueness to § 647, subdivision (c), of the California Penal code. That provision stipulated that:

> Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: ... (c) Who accosts other persons in any public place or in any place open to the public for the purpose of begging or soliciting alms.

55 Cal.App.3d at 265; 127 Cal.Rptr. at 447. The Court began with the assumption that because begging and soliciting alms did "not necessarily involve the communication of information or opinion," the practice of approaching people for those purposes was not protected speech. *Id.* Based upon its analysis of the legislative history of § 647, the Court concluded that the provision dealt specifically with the conduct of an individual who goes about the streets accosting others for handouts and that it was framed in order "to exclude from one ambit of the law the blind or crippled person who merely sits or stands by the wayside, the Salvation Army workers who solicit funds

**23.** Ark.Stat.Ann. § 14–54–1408 (1987) (City Council authorized to punish begging); Ill.Ann. Stat. ch. 24 para. 11–5–4 (Smith–Hurd 1962) (Corporate authority of each municipality); Mont.Code Ann. § 7–32–4304 (1989) (City and town council); Neb.Rev.Stat. § 14–102, cl. 23 (1987) (Cities of Metropolitan class); N.H.Rev. Stat.Ann. § 47:17, cl. XIII (Equity Publishing 1971) (City council); N.C.Gen.Stat. § 160A–179 (1987) (City); N.D.Cent.Code § 40–05–01, cl. 43 (1989) (Municipalities); Ohio Rev.Code Ann. § 715.55 (Anderson 1966) (Municipal corporations); Utah Code Ann. § 10–8–51 (1986) (City); Wash.Rev.Code Ann. § 35.22.280 (1965) (First class cities); W.Va.Code § 8–21–10 (1984) (Board of Parks and Recreation Commission); Wyoming Stat. § 15–1–103 cl. (a)(xvii) (1980) (Governing bodies of all cities and towns given authority to restrain and punish "vagrancy, mendicants and prostitutes"); N.J.Stat.Ann. § 40:48–1(7) (West 1963) (Governing body of every municipality).

**24.** La.Rev.Stat. § 14:107 (West 1986) (prohibits vagrancy, which is defined as begging or solicitation of alms by able bodied persons, though not begging or soliciting for "bona fide" religious and charitable organizations); Miss.Code

Ann. § 97–35–37 (1972) (punishes vagrants, defined as able-bodied persons who beg for a livelihood).

**25.** Ariz.Rev.Stat.Ann. § 13–2905(A)(3) (1989); Colo.Rev.Stat. § 18–9–112(2)(a) (1986); Del. Code Ann. tit. 11 § 1321(4) (1987); Ala.Code § 13A–11–9(a)(1) (1982).

**26.** Kan.Stat.Ann. § 21–4108 (1988) (prohibits vagrancy, which is defined as deriving "support in whole or in part from begging"); Minn.Stat. Ann. § 609.725 (West 1987) (same); Wisc.Stat. Ann. § 947.02(4) (West 1982); (same); Vt.Stat. Ann. tit. 13, § 3901 (1974) (vagrancy defined as transient person living without visible means of support who begs); Mass.Ann.Laws Chap. 272, §§ 63 & 64 (Law. Co-op.1980) (punishes tramps, which are described as persons begging or soliciting alms and having no residence in town within which act is committed); Mich.Comp. Laws Ann. § 750.167 (West 1968) (punishes disorderly person which is defined as any person found begging in public place). *See also* N.J. Stat.Ann. § 32:1–146.6 (West 1963) (codifying Port Authority rule which prohibits any person "unless duly authorized by the Port Authority, ... (from) solicit[ing] alms").

for charity on the streets at Christmas time and others whose charitable appeals may well be left to local control." *Id.* (quoting legislative history of California provision). Thus, the Court concluded that the statute was constitutional because it prohibited only active solicitation in the form of "[w]alking up to and approaching another for the purpose of soliciting," not the mere receipt of donations. 55 Cal.App.3d at 267; 127 Cal.Rptr. at 448.[27]

In *State ex rel. Williams v. City Court of Tucson*, 21 Ariz.App. 489, 520 P.2d 1166 (Ct.App.1974), an Arizona appellate court, in the process of rejecting a vagueness and overbreadth challenge to a statute virtually identical to New York Penal Law § 240.35(1) with the unstated assumption that begging was not protected speech, noted that:

> The word 'begging' in the ordinance we are considering refers to the solicitation of money or other valuable consideration without giving consideration in return. This is undoubtedly what it would mean to a man of ordinary intelligence when read in the context of the subject ordinance.

520 P.2d at 1170. In dissent, Judge Krucker illustrated how the distinction between charitable solicitation and begging can easily become nothing more than a distinction based upon the status of the solicitor:

> For example, imagine the following situation at the corner of Congress and Stone in downtown Tucson: a group of Salvation Army workers soliciting contributions; (2) a blind man playing his accordion with a tin cup available for contributions; and (3) a group of 'hippie-type' individuals engaged in like conduct. No one would dispute that they are all doing exactly the same thing, namely, remaining in a public place for the manifest purpose of begging. I cannot envision a police officer, under these circumstances, arresting the Salvation Army

people or the blind man. The fate of the less conventional individual, however, is more likely to be otherwise.

> Far-fetched though this illustration might appear, it serves to point up the evil denounced by [one of the early Supreme Court cases striking down loitering statutes].

*Id.* at 1172.

In *C.C.B. v. State of Florida*, 458 So.2d 47 (Dist.Ct.App.1984), a Florida appellate court held that a Jacksonville ordinance unconstitutionally infringed upon First Amendment speech. The ordinance provided:

> It shall be unlawful and a class C offense for anyone to beg or solicit alms in the street or public places of the city or exhibit oneself for the purpose of begging or obtaining alms.

*Id.* at 48. The Court distinguished *Ulmer* as a case involving an "accosting statute," and held that the Jacksonville ordinance was "unconstitutionally overbroad by its abridgment in a more intrusive manner than necessary, of the first amendment right of individuals to beg or solicit alms for *themselves*." *Id.* at 48–49 (emphasis in original). The Court recognized the city's "legitimate and compelling interest ... to control undue annoyance on the streets and public places and prevent the blocking of vehicle and pedestrian traffic," but found that that interest should be protected through "less intrusive means than absolute preclusion." *Id.* at 48. The Court concluded that though "the city may *regulate* [begging] subject to strict guidelines and definite standards closely related to permissible municipal interests," it was "not entitled to absolutely prohibit a beggar's exercise of his freedom of speech ..." *Id.* at 50 (emphasis in original).

These cases reveal that the constitutional protection afforded solicitation of money by beggars, as well as society's general attitude toward begging, are far from re-

---

**27.** *See also People v. Tosch*, 114 Ill.2d 474, 103 Ill.Dec. 715, 501 N.E.2d 1253 (1986) *cert. denied* 483 U.S. 1008, 107 S.Ct. 3235, 97 L.Ed.2d 740 (1987) (provisions which prohibited standing in a roadway and soliciting contributions except when permitted by municipal ordinance and provided that such solicitation could take place only at intersections where traffic came to a full stop and when the soliciting agency was registered with the Attorney General found to be a reasonable time, place and manner restriction).

solved. As for the specific principles articulated in these cases, the Court's decision in this case cannot rest upon the distinction between an "accosting statute" and a statute prohibiting begging, because unlike *Ulmer* none of the challenged provisions prohibits only panhandling or accosting for the purpose of begging. This case also does not involve regulations which place any narrowly tailored time, place or manner restrictions on the plaintiffs' exercise of their First Amendment rights of the type alluded to in *C.C.B.*[28]

### b) *Public Forum Analysis*

Having determined that begging can be expression protected by the First Amendment, the Court must then decide whether the New York City Transit System and the various facilities under the jurisdiction of defendants are traditional or designated public forums. The Supreme Court has held that restrictions placed upon the right of access to public property should be evaluated based upon the character of the property at issue and has distinguished three types of public property for First Amendment purposes: traditional public fora, designated public fora and non-public fora. *Perry Educ. Assoc. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44–46, 103 S.Ct. 948, 954–56, 74 L.Ed.2d 794 (1983). Traditional public fora are those that have been devoted to free expression "by long tradition or by government fiat ..." *Id.* at 45, 103 S.Ct. at 954. Non-public fora have not been recognized either by tradition or by designation as fora for public communication. *Id.* at 46, 103 S.Ct. at 955. Finally, even if the government is not required to create the forum or to retain the forum's open character indefinitely, it may create a designated public forum by opening the property for free expression. *Id.* at 45–46, 103 S.Ct. at 954–55.

 In *Wolin v. Port of New York Auth.*, 392 F.2d 83, 89–91, *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968), the Second Circuit found that the Port Authority Terminal was an appropriate forum for the distribution of leaflets, carrying placards, setting up card tables and conducting discussions with passersby. *See also Bright*, 71 N.Y.2d at 386–87, 526 N.Y.S.2d at 72, 520 N.E.2d at 1362. The Court stressed that because so many members of the public passed through the terminal, it was precisely the type of environment for free expression in a modern urban area. *Id.* at 90–91. After *Wolin*, there can be no dispute that the Port Authority Terminal and facilities similar to it are public fora.[29]

 The Court must still decide whether the New York City transit system also constitutes a public forum. Since defendants have completely banned begging and panhandling in the transit system, the Court need only decide that *some part* of the system is a traditional or limited public forum. Plaintiffs contend that by authorizing public speaking, the distribution of written non-commercial materials, artistic performances for donations, solicitation for religious and political causes, and solicitation for certain defined types of charities, the government has created a designated public forum. Defendants counter that by granting selective access to public property, the government does not automatically transform that property into a designated forum appropriate for all types of expression.

While the Supreme Court has held on several occasions that granting selective access to public property does not create a public forum, the Court as a matter of practice carefully analyzes the government's practice to determine whether it evidences an intent to open the forum to public assembly and debate. *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87

---

**28.** The Court expresses no opinion as to whether the time, place or manner restrictions on charitable solicitations in the original TA regulation, if applied to plaintiffs' conduct, would have passed constitutional muster. As noted, *see supra* p. 345, plaintiffs do not contend otherwise.

**29.** At the very least, a list of public fora would include Grand Central Station and Pennsylvania Station.

L.Ed.2d 567 (1985). In *Greer v. Spock,* 424 U.S. 828, 838 n. 10, 96 S.Ct. 1211, 1217 n. 10, 47 L.Ed.2d 505 (1976), the Court found that inviting certain select civilian speakers and entertainers to appear at Fort Dix did not convert the Fort into a public forum where political candidates could conduct their campaigns. In *Perry,* 460 U.S. at 46–48, 103 S.Ct. at 955–57, even though a Board of Education had granted certain groups access to an interschool mail system and denied a teachers group similar access, the Board had not transformed the mail system into a public forum because there was no suggestion that the general public had been permitted access. In *Cornelius,* 473 U.S. at 814, 105 S.Ct. at 3455, the Federal Government excluded legal defense and political advocacy organizations from participation in a charity drive aimed at federal employees, but the Court found that the drive itself was not a designated public forum because the government's consistent policy had been to carefully limit the participants.[30]

The TA regulation does not carefully and selectively deny access to the general public as was the case in *Greer, Perry* and *Cornelius.* Instead, it authorizes a wide variety of different forms of expression by any member of the public who wishes to take part and explicitly excludes only panhandlers and beggars. In fact, the regulation authorizes the very conduct which plaintiffs wish to engage in by authorizing solicitations for religious and political causes and for certain charities.[31] Through

its regulation, the TA tacitly acknowledges that parts of the transit system, with so much of the general public passing through them each day, are appropriate fora for such activity. Just as the Second Circuit in *Wolin* found that the admission of charitable solicitors, glee clubs and automobile exhibitions evidenced "the ease with which the [Port Authority] Terminal accommodates different forms of communication," 392 F.2d at 90, this Court finds that the scope of conduct authorized by the TA justifies the same conclusion with respect to segments of the transit system.[32] *See Lloyd Carew–Reid v. Metropolitan Transit Authority,* No. 89–7738, slip. op. at 13, 1990 WL 3216 (S.D.N.Y. January 5, 1990) (by permitting musicians to perform on subway platforms pursuant to 21 NYCRR 1050.6, TA designated subway platforms public fora for musical expression).

Defendants draw the Court's attention to the Second Circuit's assertion in *Gannett Satellite Info. Network, Inc. v. Metropolitan Transp. Auth.,* 745 F.2d 767, 773 (2d Cir.1984), that MTA stations are neither a designated nor traditional public forum.[33] It should be noted at the outset, however, that *Gannett* was decided well before the TA adopted the regulations authorizing the forms of expression now permitted in segments of the transit system. Therefore, its conclusion that the transit system is not a designated public forum is of limited precedential value. Moreover, the *Gannett* Court acknowledged that public property which is neither a traditional nor a desig-

---

**30.** *See also Calash v. City of Bridgeport,* 788 F.2d 80, 83 (2d Cir.1986) ("Selective access by civic, charitable and non-profit organizations cannot be equated with 'indiscriminate use by the general public.' ") (quoting *Perry,* 460 U.S. at 47, 103 S.Ct. at 956).

**31.** Plaintiffs asserted with respect to the earlier versions of the regulation, *see supra* p. 344, that the distinction made between solicitations for organized charity and begging were violative of their rights under the equal protection clause. Since defendant TA now totally bans begging, we need not reach this distinction.

**32.** The physical nature of the subway tunnels and stations does not preclude their being designated a public fora. *See Penthouse Int'l Ltd. v. Koch,* 599 F.Supp. 1338 (S.D.N.Y.1984) (finding

that by creating advertising display cases throughout New York subway system and by reserving them for use by advertisers who paid a fee, TA made subway system a designated public forum for generating revenue through display of public advertisements); *Fernandes v. Limmer,* 663 F.2d 619, 626–27 (5th Cir.1981), *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982) (finding that narrow and crescent-shaped terminals crowded with thousands of travelers could be public fora).

**33.** The *Gannett* Court ruled that the MTA stations were appropriate forums for newsrack newspaper sales, but that a licensing fee levied on these newsracks was a permissible manner restriction serving the significant government interest of raising revenue. 745 F.2d at 773–76.

nated public forum may still serve as a forum for free expression if that expression is "appropriate for the property." *Id.* As has been discussed above, the TA, through its regulation, tacitly acknowledges that the solicitation of money is appropriate in segments of the transit system.

### c) *State Interests*

With respect to speech in a designated public forum, the state is bound by the same standards that apply in a traditional public forum. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. Time, place, and manner regulations which are content neutral must be narrowly tailored to serve a significant government interest and must leave open ample alternative channels of communication. *Id.* at 45, 103 S.Ct. at 954. The state may enforce a content-based exclusion only if it can show that the regulation is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* Even blanket prohibitions of a particular type of speech in a public forum, such as the prohibitions at issue in this case, may sometimes be reasonable time, place or manner restrictions. *New York City Unemployed & Welfare Council v. Brezenoff,* 742 F.2d 718, 721 (2d Cir.1984); *Knolls Action Project v. Knolls Atomic Power Laboratory,* 771 F.2d 46, 50 (2d Cir.1985).[34] Therefore, the Court must consider the various state interests alleged to justify the blanket prohibitions enforced by the defendants in this case.

The first interest asserted by defendants is protecting the public from harassment and intimidation which it believes is inherent in a face-to-face confrontation with a beggar or panhandler. It is doubtful that either the TA provision or the Port Authority refusal to grant permits for begging can be considered narrowly tailored to serve this interest. Neither the TA nor the Port Authority makes any attempt to distinguish between an innocuous request for money and a threatening or intimidating demand. It should be noted that different TA regulations which are not challenged in this litigation already prohibit conduct which has "the reasonably intended effect of annoying, alarming or inconveniencing others, or otherwise tend[s] to create a breach of peace," 21 NYCRR 1050.-7(i), which "interferes with the provision of transit service or obstruct[s] the flow of traffic on facilities or conveniences," 21 NYCRR 1050.6(a), or which "causes or may tend to cause harm or damage to any person ..." 21 NYCRR 1050.7(k). Under the TA begging prohibition, the conduct of the blind beggar with a cup at his feet is prohibited in the same way as the machinations of the aggressive panhandler.

Moreover, no attempt is made to identify the specific vicinities where a passer-by is likely to face the harassment and intimidation associated with a face-to-face confrontation or where the passer-by becomes a captive audience. Plaintiffs have acknowledged the validity of restrictions which would preclude begging and all other forms of charitable solicitation on moving vehicles or near token booths, *see supra* p. 345, but defendants have thus far chosen not to pursue the alternative of adopting reasonable time, place or manner restrictions.

While the government has an interest in "preserv[ing] the quality of urban life," *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50, 106 S.Ct. 925, 930, 89 L.Ed.2d 29 (1986), and in protecting citizens from "unwanted exposure to certain methods of expression which may legitimately be deemed a public nuisance," *Members of The City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984), this interest must be discounted where the regulation has the principal effect of keeping a public problem involving human beings out of sight and therefore out of mind. Indeed, it is the very unsettling appearance and message conveyed by the beggars that gives their conduct its expressive quality. Of

---

**34.** *See also Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (blanket prohibition on symbolic sleep in Lafayette Park intended to highlight plight of homeless upheld as time, place and manner restriction).

course, the fact that expression is "objectionable to some ... does not diminish its protected status ..." *Young v. American Mini Theatres*, 427 U.S. at 85, 96 S.Ct. at 2459 (Stewart, J. dissenting).

Though *Schaumburg, Riley,* and *Munson* each struck down antifraud provisions as constitutionally defective, the Court recognized a state interest in preventing a charitable solicitor from deceiving donors as who would receive the benefits of the solicitation. *See supra* pp. 351–52. With the conduct at issue in this case, the likelihood of that type of fraud is greatly reduced. A passer-by who donates a small sum of money to a beggar knows that the beggar will in all likelihood keep the money. The passers-by make a calculated decision that the individual is worthy in some respect of their donation. While a beggar may attempt to present himself as more needy than he really is, he will almost never attempt to create the impression that the money is going to anyone but himself. Furthermore, on a more general level, defendants do not contend that a beggar or panhandler is any more likely to lie than any other speaker protected by the First Amendment.

### 3. The Challenged Provisions

Having determined that New York Penal Law § 240.35(1) violates the due process clause of the New York Constitution, that begging can be expression protected by the First Amendment, that the prohibitions at issue inhibit conduct in designated public fora, and that neither of the prohibitions is narrowly tailored to serve a significant state interest, the Court will now consider the effect of these conclusions on the individual provisions.

#### a) *21 NYCRR 1050.6(b) & (c) (Transit Authority)*

■ Because 21 NYCRR 1050.6(b) burdens constitutionally protected speech by plaintiffs in designated public fora and is not narrowly tailored to serve a significant state interest, there are serious questions as to its constitutionality both on its face and as applied to plaintiffs. The regulation totally bans panhandling and begging upon any facility or conveyance within the jurisdiction of the TA. The TA has made no effort to tailor the provision narrowly to protect the various state interests discussed above. Finally, parts of the transit system are clearly designated public fora, where a total prohibition of protected speech which is not a reasonable time, place or manner restriction, such as the prohibition in 21 NYCRR 1050.6(b), runs afoul of the Constitution.

#### b) *21 NYCRR 1220.16; 21 NYCRR 1220.25; 21 NYCRR 1290.3 (Port Authority)*

■ The Port Authority rules prohibit any person from "solicit[ing] funds or contributions for any purpose" or from "soliciting alms" in the Port Authority Bus Terminal without "permission" or unless "duly authorized by the Port Authority." 21 NYCRR 1220.20 & 1220.16. In the World Trade Center, no person "unless duly authorized in writing by the Port Authority" is permitted to "solicit funds for any purpose." 21 NYCRR 1290.3. The Port Authority represents that pursuant to the regulations permits are issued for First Amendment activities on a first come first serve basis. Because the Port Authority believed that the state penal provision prohibited begging, permits were not issued for begging and panhandling. Since § 240.35(1) violates the due process clause of the New York Constitution, the Port Authority can no longer enforce that provision by denying permits to beggars and panhandlers. Moreover, pursuant to the analysis presented in this opinion, the Port Authority can no longer enforce its total ban on begging. The Court will not speculate, however, as to what the Port Authority can do or will do in the absence of Penal Law § 240.35(1). We note again that conduct which is proscribed as unlawful must be clearly defined, especially when First Amendment rights are impacted. We find that enforcement of any ban on panhandling, begging or soliciting alms pursuant to the Port Authority rules should be preliminarily enjoined.

**360**

### III. CONCLUSION

A true test of one's commitment to constitutional principles is the extent to which recognition is given to the rights of those in our midst who are the least affluent, least powerful and least welcome. Believing that the challenged provisions, which totally ban solicitations of charity for the benefit of the solicitor in areas controlled by the defendants which are well recognized to be places where First Amendment rights may be exercised, violate the constitutional rights of the plaintiff class, we grant the motion for a preliminary injunction.

This determination is of course without prejudice to the right of the MTA and Port Authority to adopt and implement reasonable time, place and manner restrictions. Consideration should be given to restrictions which, for example, might prohibit begging on moving vehicles, areas adjacent to token or ticket booths, on narrow platforms, or at the head or foot of escalators or stairways. It is the total prohibition of *all* begging on *all* of defendants' facilities which is constitutionally impermissible. The existing provisions banning conduct which harasses, menaces, impedes traffic or otherwise causes harm are not challenged in this case and remain in force. *See supra* p. 358. There should be relatively little difficulty in designing a regulatory scheme which can reasonably accommodate the interests of both the members of the plaintiff class and the interests of those who operate or use the defendants' facilities.

Reasonable time, place and manner restrictions would not only confront the constitutional infirmities which invalidate the present regulatory scheme but would provide greater guidance to defendants' law enforcement officers. The present overbroad prohibitions not only infringe upon constitutional rights, but, as a practical matter, they may become largely unenforceable by virtue of their overbreadth. Thus, the absolute prohibitions may serve no purpose other than to threaten the exercise of constitutional rights.

 For the reasons stated in this opinion, defendants are preliminarily enjoined from enforcing, pursuant to 21 NYCRR 1050.6, 21 NYCRR 1220.25, 21 NYCRR 1290.3, 21 NYCRR 1220.16 and New York Penal Law § 240.35(1) as they now read, any prohibition on begging, panhandling or soliciting alms by the plaintiff class. Defendants are further enjoined from circulating pamphlets, exhibiting posters or using any other method to announce that such conduct is unlawful. Defendants are to undertake all reasonable efforts to delete language from pamphlets and posters currently in circulation which announces that such conduct is unlawful. This may be accomplished, in part, by a paste-over obscuring the offending language which appears on a single line of the TA posters. Plaintiffs' motions to amend their complaint and for an order determining that this action is maintainable as a class action are granted.

SO ORDERED.